UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

|  |  |
|---|---|
| AMCOR, INC. | : |
|  | : |
|  | : Case No. 08 CV 4508 |
| Plaintiff, | : |
|  | : |
| - against - | : |
|  | : |
| THE CIT GROUP/ COMMERCIAL | : |
| SERVICES, INC. | : |
|  | : |
| Defendant. | : |
|  | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## DECLARATION OF GERARD IMBRIANO IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

Gerard Imbriano, pursuant to 28 U.S.C. §1746, hereby declares:

1.     My name is Gerard Imbriano.  I am an Assistant Vice President for Defendant

The CIT Group/ Commercial Services, Inc ("CIT").  I am familiar with the business records

maintained by CIT relating to the agreement at issue in this case.  I make this Declaration in

support of CIT's Motion to Dismiss the Complaint.

2.     Attached hereto as Exhibit 1 is a true and correct copy of the Single Customer

Credit Approved Receivables Purchasing Agreement entered into between CIT and Plaintiff

Amcor, Inc. on August 31, 2007.

3.     Attached hereto as Exhibit 2 is a true and correct unexecuted copy of the

Compromise Settlement Agreement and Release (and accompanying correspondence) provided

to CIT by Plaintiff's counsel, which, upon information and belief, memorializes an agreement

entered into between Plaintiff Amcor, Inc., and its customer Linens N' Things, as a result of

dispute-settlement negotiations discussed at Paragraph Eighteen (¶ 18) of Plaintiff's Complaint.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this

23rd day of June, 2008.

_Gerard Imbriano_
Gerard Imbriano

<u>**DECLARATION OF SERVICE**</u>

Bradford C. Mulder, hereby declares under penalty of perjury, pursuant to 28 U.S.C.

§ 1746, that:

I am Managing Clerk at the law firm of Hunton & Williams LLP, attorneys for Defendant

The CIT Group/Commercial Services, Inc.

That on June 23, 2008, I served a true copy of the attached Declaration of Gerard

Imbriano in Support of Defendant's Motion to Dismiss, on Plaintiff's Counsel, at the address

listed below, via the Court's Authorized ECF Transmission Facilities.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 23, 2008

/s/ Bradford C. Mulder<br>
Bradford C. Mulder

TO:    Thomas A. Brown, II
        Orans, Elsen Lupert & Brown LLP
        875 Third Avenue, 28th Floor
        New York, New York 10020
        tbrown@oellaw.com

**Exhibit 1 to Imbriano Declaration**



August **31**, 2007

Amcor, Inc.
685A Gotham Parkway
Carlstadt, New Jersey 07072

## SINGLE CUSTOMER CREDIT APPROVED RECEIVABLES
## PURCHASING AGREEMENT

Re:  Linens N' Things (the "Customer")

Ladies and Gentlemen:

This agreement, together with the attached Statement of Additional Procedures, Terms and Conditions and Annex A and B attached thereto (the "Guide"), which Guide is incorporated herein by reference, will confirm your and our agreement (the "Agreement") concerning our performance of certain services and our purchases of certain of your accounts receivable due from the Customer. Capitalized terms used herein without definition shall have the meanings ascribed to them in the Guide:

1.      **CREDIT APPROVAL.**  You shall submit any order for which you seek our credit approval (except for those under credit lines which may have been established for the Customer) to our Credit Department either via computer on-line terminal access or, if you are unable to submit your orders via computer, then by telephone or via telecopier (but, in any event, in writing).  Our credit approval may be withdrawn any time before, but not after, shipment is made and shall be effective only if shipment is made within thirty (30) days from the date specified in the credit approval, or within thirty (30) days from the date of our credit approval if no delivery or services performance date is specified therein. Except with respect to approved sales for which shipment has been made, we shall have the right to adjust the Customer's credit lines from time to time and shall have no liability whatsoever to you or any other person, firm or entity for our not approving, or our withdrawal of approval of, credit to the Customer in the manner provided in this Agreement.

You have advised us that your selling terms are not in excess of sixty (60) days.  As to any Approved Receivable, you agree that you will <u>not</u>, without our prior written consent: (i) change these

terms from our existing credit approval, or extend the maturity date of any invoice; (ii) change the amount (except for credits you may issue in the normal course of your business and otherwise in accordance with this Agreement) or shipping dates; or (iii) grant any other indulgence. In the event you were to do any of these acts without such concurrence by us, any credit approval and assumption of credit risk by us of the respective Approved Receivable(s) shall be and become automatically and immediately, and without any further notice or action by us whatsoever, withdrawn, null, void and of no effect. You also agree to issue credit memoranda promptly (with duplicates to us) upon accepting returns or granting allowances in connection with any Approved Receivable.

2.    **SALE OF APPROVED RECEIVABLES.** You hereby sell, assign and transfer to us as absolute owner all of your Approved Receivables subject to any Permitted Lien.

3.    **HANDLING AND COLLECTING RECEIVABLES.** You shall continue to collect payment for each Approved Receivable with payment therefor being remitted directly to you or as authorized by you. Our obligation to pay you for any Approved Receivable shall only be as provided in Paragraph 7 below, and only when all requirements of this Agreement have been satisfied. Our services hereunder will be provided on a non-notification basis; that is, we will not communicate with your Customer prior to paying you for an Approved Receivable without your prior approval except as set forth in Paragraph 2 of the Guide (see Paragraph 5 of the Guide for information regarding our collection of Non-Approved Receivables). You will at all times perform your normal accounts receivable bookkeeping, collection and reporting procedures in connection with both Approved Receivables and Non-Approved Receivables. In order to maintain our credit approval in connection with any Approved Receivable (unless we withdraw or limit our credit approval as permitted by this Agreement), you also agree to perform the collection and reporting procedures (to the extent permitted by law) set forth in Paragraph 3 of the Guide. In the event we are required to commence suit to collect any delinquent Receivable, you agree to cooperate fully with us and our counsel in prosecuting same.

4.    **FEE.** For our services hereunder you agree to pay us a fee of 4% of the gross face amount of each Approved Receivable. The fee for our services under this Agreement shall be paid upon submission of the sales for approval and our purchase of the underlying Approved Receivable. In the event such fees are not paid to us as required, all credit approvals given by us and any credit risk assumed by us as to each Approved Receivable for which such applicable fees have not been paid to us shall automatically, and without any further notice or action by us whatsoever, be and become withdrawn, null, void and of no effect. In addition to the fees and charges under this

Agreement, you will pay us, as of the date hereof, a Documentation Fee in the amount of $600.00 to compensate us for the use of our in-house legal department and facilities in documenting this agreement and for the initial filing costs.

5.    **REPRESENTATIONS AND WARRANTIES.**  You hereby make to us the representations and warranties contained in Paragraph 4 of the Guide. If you breach any of these representations and warranties, we shall be released from any credit risk whatsoever on each Approved Receivable which may be involved.

6.    **REPORTING AND NOTICES.**  You will maintain, in form acceptable to us (in our commercially reasonable judgment), a detailed aging of all Receivables, payments thereon and of all returns, and you will deliver promptly to us the information and reporting set forth in Paragraph 6 of the Guide.  In the event you fail to provide this information to us within three (3) business days of its due date, after notice to you of such failure our credit approvals and assumption of credit losses shall automatically and immediately cease and be deemed to have been thereupon withdrawn, void, null and of no effect as to all Approved Receivables.  You must promptly notify us if any Approved Receivable is not timely paid or if you receive information of any adverse change in the financial condition or business prospects of the Customer. You must notify us promptly of any matters affecting the value, enforceability or collectibility of any Approved Receivable.  Please see Paragraph 8 of the Guide for information regarding our right to conduct inspections and verifications regarding the Receivables and returned merchandise.

7.    **PAYMENT OF APPROVED RECEIVABLES.**  If any undisputed Approved Receivable remains unpaid for more than ninety (90) days after its due date, and you shall have delivered to us, as further set forth herein, a written Request for Payment of  Approved Receivable in the form of **Annex B** attached to the Guide, with all of the  information and documentation therein specified, requesting that the purchase price of such overdue and unpaid Approved Receivable be paid to you, we shall promptly (subject to our verification of any such undisputed Approved Receivable having been credit approved by us and being overdue and unpaid) pay to you the Net Amount of such Approved Receivable.  You agree that when you deliver to us a Request for Payment of Approved Receivable, you shall be deemed to have thereby authorized us to collect all other unpaid Approved Receivables.  Approved Receivables that are one hundred (100) days or more past the invoice date when submitted on **Annex B** shall no longer be Approved Receivables hereunder and we are thereupon released from any liability therefor whatsoever.

Our obligation to remit funds to you for the amount of any Approved Receivable shall only apply to an Approved Receivable (a) which is free of any claims, offsets or liens whatsoever, excluding any Permitted Lien, and (b) where the inventory and/or service has been received and accepted by the Customer without return and without dispute or claim as to price, terms, quality, workmanship, breach of warranty, delivery, quantity or other offset, and (c) where nonpayment by the Customer is due solely to the Customer's financial inability to pay, and (d) which you shall have sold, assigned and transferred to us as absolute owner all of your right, title and interest thereto and therein. Please refer to Paragraph 9 of the Guide for additional information regarding the Customer's financial inability to pay. If an Approved Receivable for which we have paid you is later determined to have been unpaid by the Customer for reasons other than solely the Customer's financial inability to pay, you agree to repurchase such Approved Receivable from us for the same amount we paid to you therefor (less any remittances we may have received in connection with such Approved Receivable). After our payment to you of any Approved Receivable, any and all checks, cash, notes or other instruments or property received by you with respect to such Approved Receivable shall be held by you in trust for us, separate from your own property and funds, and promptly turned over to us. In addition, we shall be entitled in our sole discretion to retransfer to you any Approved Receivable which does not comply with your representations or warranties contained herein, including if it is or becomes subject to a claim. Please see Paragraph 10 of the Guide for additional information regarding returned merchandise, and retransfer of Receivables.

8. **SPECIAL CUSTOMER PAYMENT APPLICATIONS.** In the event you have shipped inventory in excess of any particular credit approval or credit line for the Customer, all remittances received from or on behalf of the Customer shall first be applied to payment of Approved Receivables due from the Customer until paid in cash in full, and thereafter any excess shall be applied to payment of Non-Approved Receivables. In the event a petition in bankruptcy is filed by or against the Customer, any distribution, insolvency dividend, recovery or other payment thereafter received from such proceedings shall be applied pari passu to payment of Approved Receivables and Non-Approved Receivables due from the Customer in the ratio that each bears to the aggregate amount of such distribution, dividend or other recovery payment.

9. **TERMINATION.** Either you or we may terminate this Agreement at any time by giving the other written notice of termination stating a termination date not less than sixty (60) days from the date such notice is delivered. This Agreement continues uninterrupted unless terminated as herein provided. Notwithstanding the preceding sentences of this Paragraph, we may terminate this Agreement immediately upon the occurrence of any of the following events: cessation of your business or the calling of a meeting of your creditors; your failure to meet your debts generally as

they mature; the commencement by or against you of any bankruptcy, insolvency, arrangement, reorganization, receivership or similar proceeding under any foreign, federal or state law; breach by you of any representation, warranty or covenant contained herein; or your failure to pay when due any indebtedness or obligation owing by you to us whether under this Agreement or any other agreement to which you and we are parties. We may also terminate this Agreement immediately in the event that we shall reasonably determine that any material provision of this Agreement is not enforceable under applicable law or would require any filing with, or consent or approval by, any governmental authority. Any termination of this Agreement, however, shall not affect obligations of you or us incurred hereunder prior to such termination including, without limitation, our obligation to pay for Approved Receivables arising prior to such termination date (provided that our assumption of credit risks and losses hereunder shall cease upon your failure to pay our fees when due or to deliver to us the information required by this Agreement).

10.    **MISCELLANEOUS.**  You hereby indemnify us and hold us harmless from any costs, liabilities and expenses related to this Agreement, and you shall pay to us those attorneys' fees and disbursements incurred by us resulting from our use of outside counsel or our in-house legal department in connection with any exercise or enforcement of our rights hereunder, or any modification, waiver, release or amendment, or any claims or liabilities asserted against us relating to this Agreement. This provision shall survive any termination of this Agreement.

**TO THE EXTENT PERMITTED BY APPLICABLE LAW, YOU AND WE HEREBY IRREVOCABLY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING DIRECTLY OR INDIRECTLY OUT OF THIS AGREEMENT. THE VALIDITY, INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT SHALL BE DETERMINED AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK .**

This Agreement can be changed only in writing signed by you and us.  This Agreement binds and benefits each of us and our respective successors and assigns; provided, however, that you may not assign this Agreement or your rights hereunder without our prior written consent.  You agree that we may, without notifying you, sell, assign or transfer our rights and obligations under this Agreement, including, without limitation, our rights and obligations with respect to the Approved Receivables.  Our failure or delay to exercise any right or remedy hereunder shall not constitute a waiver thereof, nor bar us from exercising any of our rights or remedies hereunder at any time, nor shall any course of dealing between you and us change or modify this Agreement. This Agreement will become effective as of the date set forth on the first page hereof but only after this Agreement shall have been accepted by one of our officers in New York, New York, after which we shall

142378v1

forward to you a fully executed copy for your records. The undersigned has been duly authorized to sign and deliver this Agreement by all necessary and appropriate action on behalf of the Company and this Agreement will be binding upon said Company when so executed and delivered.

This Agreement shall become effective only when accepted below by one of our officers. This Agreement, when accepted, contains the entire agreement between you and us. There are no verbal agreements between you and us concerning this Agreement or the subject matter hereof.

Sincerely,

THE CIT GROUP/COMMERCIAL SERVICES, INC.

By: _____

Name: _____

Title: _____

Read and Agreed to:

AMCOR, INC.

By: _____

Name: _____

Title: _____

Accepted at New York, New York

THE CIT GROUP/COMMERCIAL SERVICES, INC.

By: _____

Name: _____

Title: _____

Single Customer Credit Approved Receivables Purchase Agreement

Statement of Additional Procedures, Terms and Conditions

1.     Definitions.

"Approved Receivable" shall mean each Receivable due from your Customer which has been approved by us for credit in writing, and in which we have an exclusive, first priority lien, subject to any applicable Permitted Lien.

"Net Amount" shall mean, with respect to an Approved Receivable, the gross face amount of such Approved Receivable less any amount in payment of such Approved Receivable you may have received from or on behalf of the Customer, less any trade and cash discounts and less any credits or allowances, as further set forth in the Agreement.

"Non-Approved Receivable" shall mean a Receivable that is not an Approved Receivable.

"Permitted Lien" shall mean the perfected security interest granted by you to any bank, factor or other lender as security for loans or extensions of credit to you by such bank, factor or other lender, which are subject to such form of intercreditor agreement as we may require and request from time to time.

"Receivable" shall mean and include each separately invoiced account created by, or arising from, your sale of inventory to or performance of services for (under any of your trade names or styles or through any of your divisions) the Customer, together with all related instruments, documents, insurance proceeds and general intangibles (including payment intangibles and all other rights to payment); all proceeds thereof, including all property acquired with such proceeds; all of your rights to any merchandise which are represented thereby; and all your right, title, security, guaranties, supporting obligations and letter of credit rights with respect to each Receivable, including all rights to reclamation and stoppage in transit.

2.     Communication With the Customer. We may communicate with the Customer only (a) in connection with a past due Approved Receivables

and/or (b) to obtain current information on the Customer's financial condition and creditworthiness.

3.     Collection and Reporting Procedures.

(i)     At least once each month, the Customer on a past due Receivable shall receive your written statement detailing the delinquency. Each such statement shall age such past due Receivable(s).

(ii)     You shall document all collection related telephonic communications given to, and responses received from, the Customer concerning each delinquent Receivable. You also shall initiate telephonic communication to the Customer before the Receivable becomes thirty (30) days past due, and at least two (2) such calls shall be required in each subsequent thirty (30) day period (i.e., 31-60 days past due and 61-90 days past due) until the Receivable is ninety (90) days past due. All collection calls must involve your authorized representative speaking with a representative of the delinquent Customer who has authority to approve payments on behalf of the Customer, recording the name of such individual, his/her position with the Customer, the date and time of such call, the reason for the delinquency in payment (e.g., cash flow, dispute, paperwork, etc.), the commitment to pay date, and a follow-up date.

(iii)     In the event that your attempts to communicate telephonically with the Customer concerning a past due Receivable are to no avail (e.g., the telephone has been disconnected), your records must so indicate, and you shall then communicate with the Customer in writing.

4.     Representations and Warranties. You hereby represent and warrant that:

(i)     Your legal name is exactly as set forth on the signature page of the Agreement, and you are duly organized, validly existing and in good standing under the laws of the state of your incorporation or organization and are duly qualified

to transact business in and are in good standing in all states where required;

(ii)    There are no provisions in your (x) articles of organization or incorporation or bylaws (or any amendments thereto) or (y) in any of your contracts or indentures restricting your compliance with, or your undertaking the acts contemplated by, this Agreement, or (z) requiring the consent or authorization of any person or entity that has not already been obtained, including without limitation, any secured party who may be entitled to notice of execution and delivery of this Agreement;

(iii)    Each Receivable represents an actual and bona fide sale and delivery of inventory or performance of services in the ordinary course of your business, and the inventory being sold and the Receivables created therefrom are your exclusive property;

(iv)    As to each Approved Receivable, the Customer is obligated to pay, in United States Dollars, the full amount stated in the invoice according to its terms without dispute, offset, deduction, defense or counterclaim;

(v)    No inventory sold is subject to any consignment arrangement; all taxes and fees with regard to any Approved Receivable or the inventory sold or services performed are solely your responsibility; and

(vi)    None of the Approved Receivables represents sales or services to any subsidiary, parent or affiliated company.

5.    Collection of Non-Approved Receivables. You may request that we collect for you, at your expense, any Non-Approved Receivable in accordance with our usual practices. In such event, any moneys collected by us on any Non-Approved Receivables will be promptly remitted to you (or as authorized by you, if requested in writing), ten (10) days after our receipt of good funds, less any additional service charge due and payable to us as provided in **Annex A** attached hereto.

6.    Reporting and Other Information.

You shall provide to us:

(i) On the earlier of: (x) ten (10) days after the end of each month, (y) upon your issuance thereof or (z) at any time at our reasonable request, in form acceptable to us (in our commercially

reasonable judgment), your aged trial balances of all of your outstanding Receivables owing from the Customer;

(ii)    On the earlier of: (x) ten (10) days after the end of each month, (y) upon your issuance thereof or (z) at any time at our reasonable request, in form acceptable to us (in our commercially reasonable judgment), your sales journal of all your outstanding Receivables owing from the Customer;

(iii)    Within ten (10) days after the end of each month, without duplication of the foregoing, your proper reconciliations between your aged trial balances and your Receivables owing from the Customer, together with a schedule for the preceding month of each of your Receivables owing from the Customer which you have recorded and clearly identified as Approved Receivables (including those under any credit lines we may have established for the Customer) and their respective sales terms, invoice numbers, dates and amounts

(iv)    Prompt notice of any change in your: name, state of incorporation or registration, location of your chief executive office, place(s) of business, and legal or business structure.

7.    Collection of Approved Receivables. We shall have the right to communicate with and, if necessary in our discretion, commence collection proceedings with respect to, the Customer if: (a) any portion of the Customer's Approved Receivables whatsoever is past due by ten (10) business days or more, or (b) the Customer has undergone an adverse change in its financial condition or business prospects, or (c) the Customer has called a meeting of its creditors or ceased to do business, or (d) the Customer suffered a petition in bankruptcy or insolvency filed by or against the Customer under any foreign, provincial or federal or state law.

Within ten (10) Days of our request to you or from the date of our payment of the price of any Approved Receivable, you shall deliver to the Customer a notice of assignment (as we may reasonably request and provide from time to time to you). At our request, from time to time, you shall use reasonable efforts to cooperate with us in any attempt to comply with our request to file a proof of claim, and including pursuant to Rule 3001(e) of the Federal Rules of Bankruptcy Procedure ("FRBP"), and any additional rules, statutes or orders

concerning the transfer of the Approved Receivable or any portion thereof (collectively, "Transfer Rules"). Provided that the purchase price applicable thereto has been received by you, you hereby waive any and all objections to the transfer of the Approved Receivables and the claims with respect thereto and any right to receive notice pursuant to FRBP 3001(e) of such transfer

8.   Inspection and Verification. We may (with prior notice to you) at any time during normal business hours verify and inspect all of your books, accounts, records, files, orders, correspondence and papers which we may deem to be reasonably relevant to the Receivables, the Customer, and/or this Agreement, and your credit and collection procedures and business operations, and we may make photocopies of or extracts from any of the foregoing and inspect any returned merchandise.

9.   Financial Inability to Pay. The Customer's financial inability to pay any Approved Receivable does not include any failure (or refusal) to pay arising from or directly related to (i) changes, of whatever nature, in government or governmental policy, or (ii) the enactment of laws or regulations or the taking of any action, of whatever nature including, without limitation, the taking or nationalizing of private property by any governmental entity whereby payment may not be made or may be made only upon penalty or (iii) natural disaster or act of God, uprising, civil war, civil commotion, war, revolution, invasion and other acts of violence.

10.   Returned Merchandise, Claims and Approved Receivables. (a) In the event merchandise in connection with an Approved Receivable is offered to be returned to you by the Customer solely as a result of the Customer's financial inability to pay for such merchandise, and for which Approved Receivable we shall have already remitted funds to you for the amount thereof, or shall be obligated to remit to you, under this Agreement, then you shall promptly notify us in writing of such offer with all particulars and, upon our written approval to you of your acceptance of such offer of return, you may accept the return of such merchandise, provided such merchandise is returned to you free and clear of all liens and security interests.

(b) Any merchandise which you may receive in connection with such approval of return of

merchandise under an Approved Receivable, solely as a result of the Customer's financial inability to pay, shall: (x) be and at all times be deemed to be our property; (y) at our option, be promptly delivered by you to us at such place as we shall reasonably specify; or (z) at our option, be retained by you for resale by you, employing your best efforts, and us at the best available price. In the event of resale of such returned merchandise to another customer as contemplated by the preceding sentence, (i) if we shall have already remitted funds to you in accordance with this Agreement for the amount of such Approved Receivable, then all proceeds of such resale shall be paid to us or be promptly turned over to us, or (ii) if we shall have not have so remitted to you the amount of such Approved Receivable but shall be obligated to remit funds to you for the amount of such Approved Receivable under this Agreement, then all proceeds of such resale shall be paid to you or be promptly turned over to you, and the difference (if any) between the invoice amount of such Approved Receivable and the proceeds of such resale shall be owing by us to you and promptly remitted by us to you upon the consummation of, and your receipt of the proceeds of, such resale

(c) In addition, we shall be entitled in our sole discretion to retransfer to you any Approved Receivable for which we have made payment and with respect to which the Customer asserts any claim or offset. Upon receipt by you of any retransfer notice, you shall promptly (but in no event later than ten (10) days from the date of such notice) pay to us, by wire transfer of immediately available funds to our account (or such other account as we may specify in writing from time to time), the purchase price with respect to such Approved Receivables plus interest at the JPMorgan Chase Bank, National Association prime rate plus two percent (2%) for the period from and including the date on which payment was made by us with respect to any such Approved Receivable through the date of such repayment.

11.   Financing Statements. You agree to comply with all applicable laws to perfect our interest in the Approved Receivables, and to execute such documents as we may require to effectuate the foregoing and to implement this Agreement. You hereby irrevocably (i) authorize us to file financing statements and all amendments

142378v1

and continuations with respect thereto, all in order to create, perfect and maintain our interest in the Approved Receivables, (ii) ratify and confirm any and all financing statements, amendments and continuations with respect thereto heretofore and hereafter filed by us pursuant to the foregoing authorization, and (iii) agree to reimburse us for the cost of any such filing and preparation fees, and for any Uniform Commercial Code and other applicable search fees.

ANNEX A

TO THE SINGLE CUSTOMER CREDIT APPROVED RECEIVABLES PURCHASING AGREEMENT

ADDITIONAL TERMS AND CONDITIONS

As permitted in Paragraph 5 of the Guide, AMCOR, INC., a New Jersey corporation (the "Client")
hereby agrees that, in the event THE CIT GROUP/COMMERCIAL SERVICES, INC. ("CIT") collects any Non-
Approved Receivable on behalf of the Client, CIT shall be entitled to receive, and the Client shall pay or cause
to be paid to CIT, the following Collection Processing Charge and Collection Service Fee in connection with
each such Non-Approved Receivable:

**Collection Processing Charge**

There shall be a processing charge of $100 for each Non-Approved Receivable collection account
turned over to CIT by Client for collection processing by CIT.

**Collection Service Fee**

CIT shall also be entitled to receive a collection service fee of 10% of all moneys collected by CIT or
the Client, net of attorneys' fees and all other related costs and expenses incurred by or on behalf of CIT in
connection with collection of any Non-Approved Receivable.

AMCOR, INC.

By: _____
Name: _____ROBERT LAMAN_____
Title: _____PRESIDENT_____

THE CIT GROUP/COMMERCIAL SERVICES, INC.

By: _____
Name: _____
Title: _____Vice President_____

ANNEX  B

## TO THE SINGLE CUSTOMER CREDIT APPROVED RECEIVABLES PURCHASING AGREEMENT
### REQUEST FOR PAYMENT OF APPROVED RECEIVABLE(S)
#### Confirmatory Assignment Number

To:  The CIT Group/Commercial Services, Inc.            Date: 01/28/08            , 2007

Your payment to us for the outstanding past due Approved Receivable account of _____
LINEN N THING            having an address at 6 BRIGHTON RD .
CLIFTON  NJ  0792            ("Customer")
in the net amount of $ 45756256⁰⁰ is hereby requested pursuant to the terms of the Single
Customer Credit Approved Receivables Purchasing Agreement (the "Agreement").  We hereby
confirm our sale to you of such Approved Receivable(s) of said Customer pursuant to the terms of
the Agreement.

Your obligation to pay us the net amount of such Approved Receivable(s) as the purchase
price thereof arises under your credit approval dated AUG. 31.            ,2007 in the amount of
$ 9.000.000.

As evidence of  each past due Approved Receivable, enclosed are:

A.    Two copies of the outstanding invoice and any credit memos;

B.    A notarized statement of the Customer's account;

C.    One copy of all correspondence to and from the Customer;

D.    One copy of our complete collection file on the Customer;

E.    All guarantees, collateral documents, and security agreements relative thereto;

F.    Proof of delivery to and/or acceptance by Customer; and

G.    Copy of Customer's purchase order and/or our signed confirmation thereof.

We certify that: (i) the above information and enclosures are true and correct ; (ii) our
Customer (account debtor) named in the invoice(s) is indebted to us in the net amount(s) shown
thereon and is not entitled to credits or counterclaims except as reflected in the amount demanded
by us above; (iii) each Approved Receivable for which we hereby request payment from you under
the Agreement is free of any claim, offset or lien whatsoever; (iv) nonpayment by the Customer of

142378v1                            Page 12 of 13

the Approved Receivable for which we hereby request payment from you under the Agreement is due <u>solely</u> to the Customer's financial inability to pay; (v) we have sold, assigned and transferred to you as absolute owner all of our right, title and interest in each Approved Receivable for which we hereby request payment from you under the Agreement and shall have delivered to you those UCC releases and financing statements as you shall have requested to effect each such sale and transfer; and (vi) all of our representations and warranties in the Agreement are true and correct.

**AMCOR, INC.**

By: _____

Name: _____

Title: _____

# EXHIBIT B

**ANNEX B**

**TO THE SINGLE CUSTOMER CREDIT APPROVED RECEIVABLES PURCHASING AGREEMENT**

**REQUEST FOR PAYMENT OF APPROVED RECEIVABLE(S)**

**Confirmatory Assignment Number**

To: The CIT Group/Commercial Services, Inc.            Date: 01/28/08 , 2007

Your payment to us for the outstanding past due Approved Receivable account of _____ LINEN N THING _____ having an address at 6 BRIGHTON RD. CLIFTON NJ 0792 _____ ("Customer") in the net amount of $457562560 is hereby requested pursuant to the terms of the Single Customer Credit Approved Receivables Purchasing Agreement (the "Agreement"). We hereby confirm our sale to you of such Approved Receivable(s) of said Customer pursuant to the terms of the Agreement.

Your obligation to pay us the net amount of such Approved Receivable(s) as the purchase price thereof arises under your credit approval dated AUG. 31. ,2007 in the amount of $9.000.000 .

As evidence of each past due Approved Receivable, enclosed are:

A.    Two copies of the outstanding invoice and any credit memos; ✓

B.    A notarized statement of the Customer's account;

C.    One copy of all correspondence to and from the Customer; ✓

D.    One copy of our complete collection file on the Customer; ✓

E.    All guarantees, collateral documents, and security agreements relative thereto;

F.    Proof of delivery to and/or acceptance by Customer; and ✓

G.    Copy of Customer's purchase order and/or our signed confirmation thereof. ✓

We certify that: (i) the above information and enclosures are true and correct ; (ii) our Customer (account debtor) named in the invoice(s) is indebted to us in the net amount(s) shown thereon and is not entitled to credits or counterclaims except as reflected in the amount demanded by us above; (iii) each Approved Receivable for which we hereby request payment from you under the Agreement is free of any claim, offset or lien whatsoever; (iv) nonpayment by the Customer of

142378v1

Page 12 of 13

the Approved Receivable for which we hereby request payment from you under the Agreement is due <u>solely</u> to the Customer's financial inability to pay; (v) we have sold, assigned and transferred to you as absolute owner all of our right, title and interest in each Approved Receivable for which we hereby request payment from you under the Agreement and shall have delivered to you those UCC releases and financing statements as you shall have requested to effect each such sale and transfer; and (vi) all of our representations and warranties in the Agreement are true and correct.

**AMCOR, INC.**

By: _Igal Walkin_

Name: _IGAL Walkin_

Title: _CFO._

**Exhibit 2 to Imbriano Declaration**

# ORANS ELSEN LUPERT & BROWN LLP
## ATTORNEYS

SHELDON H. ELSEN
LESLIE A. LUPERT
ROBERT L. PLOTZ
THOMAS A. BROWN I

875 THIRD AVENUE
NEW YORK, N.Y. 10022

TELEPHONE: (212) 586-2211
FAX: (212) 765-3662
www.oellaw.com
E-Mail: oel@oellaw.com

April 9, 2008

BY FED EX

Bruce Tenzer, Esq.
Vice President and Assistant Chief Counsel
The CIT Group/Commercial Services, Inc.
11 West 42nd Street
New York, New York 10036

> Re:     Amcor Inc.- Request Under The Single Customer Approved Receivables
> Purchasing Agreement dated August 31, 2007 between Amcor and CIT (the
> "Agreement")

Dear Mr. Tenzer:

As you know, I am the attorney for Amcor, Inc. ("Amcor"). Pursuant to the terms of the Agreement, I write to inform you that Amcor has been in discussion with Linens N' Things ("LNT") and has reached a settlement agreement concerning the amount owed by LNT to Amcor. Accordingly, Amcor and LNT have agreed to resolve the issues between them related to Global Positioning Units pursuant to the enclosed Settlement Agreement. Amcor intends to execute and dispatch this Settlement Agreement to LNT tomorrow, April 10. Please advise me no later than 4:00 p.m. on April 10, whether CIT has any objection to the enclosed Settlement Agreement.

Amcor, Inc. specifically reserves all of its rights and remedies under the Agreement and applicable law.

Very Truly Yours,

Thomas A. Brown

cc: Robert Kramer
Enclosure

## COMPROMISE SETTLEMENT AGREEMENT AND RELEASE

This Compromise Settlement Agreement and Release (the "Settlement Agreement" or "Agreement") is entered into between Amcor, Inc. ("AMCOR"), on the one hand, and LNT Merchandising Company, a Delaware limited liability company ("LNT"), on the other hand.

### RECITALS

WHEREAS AMCOR and LNT entered into a Vendor Agreement for "Linens 'N Things" dated as of May 8, 2007 ("Vendor Agreement," a copy of which is attached hereto as Exhibit A);

WHEREAS pursuant to the Vendor Agreement, LNT placed orders for 85,000 units of the AMCOR 3900 Black, Samsung 400 Mhz Sirfill, 1 GB SD, NA, no AC, with multi media ("GPS Units").

WHEREAS AMCOR delivered 60,000 GPS Units to LNT (the "60,000 GPS Units");

WHEREAS AMCOR sent LNT invoices for the 60,000 GPS Units (a list of the invoices between AMCOR to LNT are identified on Exhibit B);

WHEREAS LNT notified AMCOR of LNT's intention to cancel the delivery of 25,000 GPS Units to LNT (the "25,000 GPS Units");

WHEREAS LNT has contended that (a) many of the 60,000 GPS Units are defective and that LNT not be should be required to pay the full amount of the invoices on the 60,000 GPS Units, and (b) LNT cancelled the delivery of the 25,000 GPS Units due to untimeliness, and that the cancellation was legal and appropriate, and that LNT should not be required to pay any amount amounts relating to the 25,000 GPS Units (collectively, the "LNT Claims");

WHEREAS AMCOR has contended that (a) LNT's claims that many of the 60,000 GPS Units are defective is meritless and that LNT should be required to pay the full amount of the invoices on the 60,000 GPS Units, and (b) LNT had no basis for its attempt to cancel the 25,000 GPS Units, the 25,000 GPS units were manufactured and shipped on time, LNT's purported

cancellation of the 25,000 GPS Units is of no force and effect, the 25,000 GPS Units were manufactured solely for LNT, LNT is contractually obligated to take delivery of the 25,000 Units, and LNT's attempt to justify withholding payment on various grounds is impermissible under the Vendor Agreement (collectively, the "AMCOR Claims");

WHEREAS from December 2007 through March 2008, LNT and AMCOR have exchanged correspondence relating to the LNT Claims and the AMCOR Claims (the "Settlement Correspondence," some of which is attached hereto as Exhibit C);

WHEREAS, bona fide disputes and controversies exist between AMCOR on the one hand, and LNT, on the other hand;

WHEREAS, it is the desire of AMCOR and LNT to compromise and settle all matters and issues in dispute between and among them—without mediation, arbitration or litigation, and without any admission of liability—based on the disputes set forth in the Invoices and the Settlement Correspondence, relating in any way and every way to the LNT Claims and the AMCOR Claims or any other claims relating to payments on the 60,000 GPS Units and/or the 25,000 GPS Units (collectively, the "Dispute").

## DEFINITIONS

1.        Definitions.    Quoted terms not otherwise defined in this Settlement Agreement, and for the purpose of this Settlement Agreement only, shall have the following meanings:

      a.        "Parties" shall mean AMCOR and LNT, collectively.

      b.        "Party" shall mean either AMCOR or LNT, individually.

## SETTLEMENT TERMS

NOW, THEREFORE, for good and valuable consideration, the sufficiency of which is hereby acknowledged by AMCOR and LNT, they do hereby covenant and agree as follows:

2.    General Statement of Settlement.  The Parties acknowledge and agree that this Settlement Agreement represents a settlement of all disputes, claims, or potential causes of action that AMCOR or LNT could have or already have brought based on the Dispute.  It is expressly acknowledged and agreed that the terms of this Settlement Agreement are contractual and not merely recitations of fact.

3.    Payment Terms.

    a.    Balance Payment.  Within thirty (30) days of the date that LNT receives from AMCOR a fully-executed version of the Settlement Agreement, LNT will pay $3,363,963.67 to AMCOR by check made payable to "AMCOR Inc." and sent via Federal Express to AMCOR, Inc., 685A Gotham Parkway, Carlstadt, New Jersey 07072 (the "Balance Payment").  The Balance Payment is calculated as follows:  $4,038,963.60 (starting balance), minus $500,000.00 (amounts LNT is holding back for Rebates as described in paragraph 3.c), minus $175,000.00 (amounts LNT is holding back for Customer Returns as described paragraph 3.d).

    b.    25,000 GPS Units.  Within thirty (30) days of the date that LNT receives from AMCOR a fully-executed version of the Settlement Agreement, LNT will pay $250,000.00 to AMCOR by check made payable to "AMCOR Inc." and sent via Federal Express to AMCOR, Inc., 685A Gotham

Parkway, Carlstadt, New Jersey 07072 (the "25,000 GPS Units Payment").

c.      <u>Rebates</u>. LNT will pay future rebates directly to LNT customers of the 60,000 GPS Units up to $500,000 (the "Rebate Amounts"). If, as of July 1, 2008, the Rebate Amounts are less than $500,000.00, LNT will pay AMCOR the difference between $500,000.00 and the Rebate Amounts by check to "AMCOR Inc." and sent via Federal Express to AMCOR, Inc., 685A Gotham Parkway, Carlstadt, New Jersey 07072. If the Rebate Amounts exceed $500,000.00, within thirty (30) days after LNT provides notice of the final Rebate Amounts to AMCOR, AMCOR will pay the amounts exceeding $500,000.00 to LNT by check made payable to "Linens & Things" and sent via Federal Express to Linens & Things, 6 Brighton Road, Clifton, New Jersey 07012. If rebates are paid after July 1, 2008, and LNT has not retained funds to pay those rebates, LNT will provide notice of any such Rebate Amounts to AMCOR. Within thirty (30) days after LNT provides notice of any such additional Rebate Amounts, AMCOR will pay those amounts to LNT by check made payable to "Linens & Things" and sent via Federal Express to Linens & Things, 6 Brighton Road, Clifton, New Jersey 07012.

d.      <u>Customer Returns</u>. LNT will pay future customer returns directly to LNT customers of the 60,000 Units up to $175,000 (the "Return Amounts"). If, as of February 1, 2009, the Return Amounts are less than $175,000.00, after LNT pays all future customer returns, LNT will pay AMCOR the

difference between $175,000.00 and the Return Amounts by check to "AMCOR Inc." and sent via Federal Express to AMCOR, Inc., 685A Gotham Parkway, Carlstadt, New Jersey 07072. LNT will continue to send GPS Units returned by LNT customers back to AMCOR. If the Return Amounts exceed $175,000.00, within thirty (30) days after LNT returns the GPS Units to AMCOR, AMCOR will pay the amounts exceeding $175,000.00 to LNT by check made payable to "Linens & Things" and sent via Federal Express to Linens & Things, 6 Brighton Road, Clifton, New Jersey 07012.

4.    Additional Payment Terms.  AMCOR will approve two vendor chargebacks for $167,949.60 (VCB# 96994, a copy of which is attached as Exhibit D) and $25,000.00 (VCB #96995, a copy of which is attached as Exhibit E).  These approvals will not impact in any way the Payment Terms discussed in paragraph 3.  LNT agrees that there are no other vendor chargebacks that could apply to any of the GPS Units.

5.    No Admission of Liability.  The Parties have all concluded that litigating the Dispute would be protracted and expensive for all Parties and that settlement is desirable.  The Parties have also taken into account that there is always uncertainty as to the outcome of litigation. The Parties therefore deem it desirable and beneficial that the Dispute be settled in the manner and upon the terms and conditions set forth herein.  No Party admits to any wrongdoing or liability.

6.    Breach.  In the event of a breach of the Settlement Agreement, the prevailing party in a proceeding to enforce this Settlement Agreement, whether by specific performance, temporary injunctive relief, preliminary injunctive relief, permanent injunctive relief, a suit for

COMPROMISE SETTLEMENT AGREEMENT AND RELEASE                    Page-5

damages, or otherwise, shall be entitled to recover, in addition to any other proper relief, its reasonable and necessary court costs, litigation expenses (including but not limited to reasonable and necessary copying charges, postage, and telecommunication charges), and attorneys' fees incurred in the successful prosecution of such litigation.

7.    Mutual Cooperation.  The Parties agree to cooperate fully and to execute any and all supplemental documents after time to review and negotiate and to take additional actions that may be necessary or appropriate to give full force and effect to the basic terms and intent of this Agreement.

8.    Mutual Warranties.  Each Party represents and warrants to the other that:

a.    A duly authorized representative of the Party has read this Agreement in its entirety;

b.    The Party has discussed all aspects of this Agreement with its attorneys and fully understands all of the provisions and their legal and practical effect;

c.    The consideration provided for herein is good and valuable;

D.    *THE PARTY IS ENTERING INTO THIS AGREEMENT VOLUNTARILY, OF ITS OWN FREE WILL, AND WITHOUT ANY COERCION, UNDUE INFLUENCE, THREAT, OR INTIMIDATION OF ANY KIND OR TYPE WHATSOEVER;*

e.    The Party has not assigned, pledged, or transferred or purported to assign or transfer to any person or entity any claim, counterclaim, third-party claim, or right which the Party purports to maintain, possess, or own or any portion thereof or interest therein;

**COMPROMISE SETTLEMENT AGREEMENT AND RELEASE**                                      Page-6

f.    All Parties are represented by counsel, and counsel for all Parties have reviewed the Settlement Agreement and counseled their respective clients with regard to the Settlement Agreement before their respective clients signed the Settlement Agreement; and

g.    The person executing this Agreement on behalf of such Party is fully authorized and legally competent to execute this Agreement as the legal, valid and binding act and deed of such Party and is a duly authorized representative of such Party.

9.    <u>AMCOR'S Release</u>.  Subject only to the terms, provisions, limitations and exceptions set forth herein, for and in consideration of the promises, obligations, releases, other lawsuits undertaken, and recitals set forth herein, which recitals are expressly made a part of the consideration of the Settlement Agreement, AMCOR, on its own behalf and on behalf of its agents, servants, attorneys, employees, parent corporations, parent stockholders, officers and directors of parent's subsidiaries, representatives, successors and assigns, releases and forever discharges LNT and each of its parent corporations, subsidiary corporations, affiliated entities, predecessors, successors and assigns, and any of its present and former directors, officers, employees, shareholders, agents, partners, privities, representatives, attorneys, accountants, and all persons acting by, through, under or in concert with them, or any of them, from any and all manner of action, causes of action, claims, demands, rights, suits, obligations, debts, contracts, agreements, promises, liabilities, damages, charges, losses, costs, expenses and attorneys' fees, of any nature whatsoever, known or unknown, in law or equity, fixed or contingent, whether or not arising out of or relating to any of the acts, omissions or other conduct that have or could have been alleged or otherwise referred to by the parties relating to the Dispute.  Nothing herein

COMPROMISE SETTLEMENT AGREEMENT AND RELEASE          Page-7

shall be construed as a release or waiver of any party's obligations under the Settlement Agreement. In addition, AMCOR, and each of AMCOR's successors, assigns, legatees, heirs, and personal representatives, expressly waive and relinquish, to the fullest extent permitted by law, the provisions, rights and benefits of Section 1542 of the California Civil Code, or any other similar provision under federal or state law, which provides:

> **A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.**

AMCOR fully understands that the facts upon which this Settlement Agreement is executed may hereafter be other than or different from the facts now believed by AMCOR and its counsel to be true and expressly accepts and assumes the risk of such possible difference in facts and agrees that this Settlement Agreement shall remain effective notwithstanding any such difference in facts.

10.    <u>LNT's Release</u>. Subject only to the terms, provisions, limitations and exceptions set forth herein, for and in consideration of the promises, obligations, releases, other lawsuits undertaken, and recitals set forth herein, which recitals are expressly made a part of the consideration of the Settlement Agreement, LNT, on its own behalf and on behalf of its agents, servants, attorneys, employees, parent corporations, parent stockholders, officers and directors of parent's subsidiaries, representatives, successors and assigns, releases and forever discharges AMCOR and each of its parent corporations, subsidiary corporations, affiliated entities, predecessors, successors and assigns, and any of its present and former directors, officers, employees, shareholders, agents, partners, privities, representatives, attorneys, accountants, and all persons acting by, through, under or in concert with them, or any of them, from any and all manner of action, causes of action, claims, demands, rights, suits, obligations, debts, contracts,

agreements, promises, liabilities, damages, charges, losses, costs, expenses and attorneys' fees,

of any nature whatsoever, known or unknown, in law or equity, fixed or contingent, whether or

not arising out of or relating to any of the acts, omissions or other conduct that have or could

have been alleged or otherwise referred to by the parties relating to the Dispute. Nothing herein

shall be construed as a release or waiver of any party's obligations under the Settlement

Agreement. In addition, LNT, and each of LNT's successors, assigns, legatees, heirs, and

personal representatives, expressly waive and relinquish, to the fullest extent permitted by law,

the provisions, rights and benefits of Section 1542 of the California Civil Code, or any other

similar provision under federal or state law, which provides:

> **A general release does not extend to claims which the creditor does not know
> or suspect to exist in his or her favor at the time of executing the release,
> which if known by him or her must have materially affected his or her
> settlement with the debtor.**

LNT fully understands that the facts upon which this Settlement Agreement is executed may

hereafter be other than or different from the facts now believed by LNT and its counsel to be true

and expressly accepts and assumes the risk of such possible difference in facts and agrees that

this Settlement Agreement shall remain effective notwithstanding any such difference in facts.

11. <u>Exception to Releases</u>.  Notwithstanding the foregoing releases set forth in

paragraphs 9 and 10 of this Agreement,  the obligations of the Parties under this Agreement shall

survive such releases, and the foregoing releases shall not serve as a bar of defenses to any

claims or actions seeking enforcement of this Agreement.

12. <u>Multiple Copies of Agreement</u>.  This Settlement Agreement may be executed in a

number of identical counterparts or with detachable signature pages and shall constitute one

agreement, binding upon all Parties thereto as if all Parties signed the same document.  The

Parties further agree that copies of this Agreement, including any facsimile copies or .pdf file copies with signatures, shall be binding and treated as an original agreement.

13.    <u>Construction of Agreement</u>.    The terms of this Agreement shall not be construed against any Party as the drafting party.    The terms and provisions of this Agreement have been jointly agreed to and negotiated by the Parties and represent their collective agreement, and therefore any rule that construes ambiguities against the drafter shall have no force or effect.    All personal pronouns used in this Settlement Agreement, whether used in the masculine, feminine or neutral gender, shall include all other genders, and the singular shall include the plural and vice versa.

14.    <u>Binding Agreement</u>.    This Agreement is binding upon—and shall inure to the benefit of—the Parties' heirs, successors in-interest, affiliates, and assigns.

15.    <u>Costs and Attorneys' Fees</u>.    Except as provided for otherwise in paragraph 6 Settlement Agreement, each Party shall bear, pay and discharge all of its respective expenses (including, but not limited to, attorneys' fees) incurred in connection with the Dispute and the negotiation, execution, and performance of this Settlement Agreement.

16.    <u>Severability</u>.    If any provision of this Agreement is prohibited by law, such prohibition shall not affect the validity of the remaining provisions of this Agreement.

17.    <u>Integration Clause and Reaffirmation of Vendor Agreement</u>.    This Settlement Agreement and its attached Exhibits A – E state the entire Settlement Agreement of the Parties with respect to the matters discussed herein, and they supersede all prior or contemporaneous oral or written understandings, settlement agreements, statements, or promises, except for the Vendor Agreement, which shall apply to dealings between AMCOR and LNT, except as concerns the Dispute.    The Parties reaffirm that the Vendor Agreement is still an operative and

enforceable agreement, and the Parties agree to continue abiding by the terms of the Vendor

Agreement, except that no provision of the Vendor Agreement can modify the resolution of the

Dispute as set forth in this Agreement

18.     <u>Modifications in Writing Only</u>.  This Settlement Agreement may not be amended

or modified in any respect except by a written instrument duly executed by all of the Parties to

this Settlement Agreement or their counsel.

19.     <u>Headings</u>.  The headings and captions contained in this Settlement Agreement are

inserted only as a manner of convenience and in no way define, limit, extend, or describe the

scope of this Settlement Agreement or the intent of any provision thereof.

20.     <u>No Third Party Beneficiaries</u>.  Except as expressly provided herein, nothing in

this Agreement shall be construed so as to confer upon any other person or entity, the rights of a

third-party beneficiary.

21.     <u>Recitals</u>.  Each of the Recitals is incorporated herein by this reference and shall

become part of the Settlement Agreement.

22.     <u>Governing Law and Venue</u>.  The Agreement shall be governed by, construed, and

interpreted in accordance with the domestic laws of the State of New Jersey, without regard to

the conflict-of-laws principles thereof, and irrespective of any conflict-of-law provision or other

law or rule that would result in the application of the law of another jurisdiction.  Any litigation

to enforce this Settlement Agreement shall take place in a court located in New Jersey.

23.     <u>Confidentiality.</u>  The Parties agree that the terms and conditions of this Settlement

Agreement are confidential and are not to be disclosed to any third parties for any purpose,

except to the minimum extent necessary as required by law or by court order.  The Parties may

also disclose the terms of this Settlement Agreement to their respective officers, directors,

shareholders, attorneys and employees, to the limited extent necessary to obtain appropriate approvals of the Settlement Agreement and to fulfill their respective obligations contained in the Settlement Agreement. If any disclosures described in this paragraph become required, the disclosing party shall take all steps reasonably possible to prevent the further disclosure of the settlement terms. If asked about the resolution of this case other than for any of the Parties to obtain appropriate approvals of the Settlement Agreement and to fulfill its or obligations, or for any party in response to proper judicial process, the Parties hereto agree that they will only disclose that "the case was settled on mutually acceptable terms, and the parties have agreed not to disclose those terms." **THE PARTIES HERETO AGREE THAT ANY BREACH OF THE CONFIDENTIALITY PROVISIONS CONTAINED IN THIS PARAGRAPH SHALL BE DEEMED A MATERIAL BREACH OF THIS SETTLEMENT AGREEMENT.**

    24.    <u>List of Exhibits</u>. The following exhibits are attached hereto:

| | |
|---|---|
| Exhibit A | Vendor Agreement. |
| Exhibit B | List of Invoice Numbers and Dates. |
| Exhibit C | Settlement Correspondence. |
| Exhibit D | VCB# 96994 |
| Exhibit E | VCB# 96995 |

IN WITNESS WHEREOF, the Parties have caused the Settlement Agreement to be executed, effective as of the later date written below.

By:

AMCOR INC.

By: _____

Printed Name:  Robert Kramer

Its: President

Date: _____

Counsel for AMCOR INC.

_____
Thomas A. Brown II

LNT MERCHANDISING COMPANY, A DELAWARE LIMITED LIABILITY COMPANY

By: _____

Printed Name:  Scott Silver

Its: Executive Vice President

Date: _____

Counsel for LNT Merchandising Company, a Delaware Limited Liability Company

_____

Barry Golden

STATE OF _____    §

COUNTY OF _____    §


BEFORE ME, the undersigned Notary Public in and for said County and State, on this day personally appeared Robert Kramer, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that this person has read the foregoing Settlement Agreement, and fully understood the same, and that this person executed the same, knowingly and voluntarily for the purposes and consideration therein expressed and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ of April, 2008.


Signed, sealed and delivered before me this _____ day of April, 2008


_____
NOTARY PUBLIC

STATE OF _____          §

COUNTY OF _____          §


     BEFORE ME, the undersigned Notary Public in and for said County and State, on this day personally appeared Scott Silver, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that this person has read the foregoing Settlement Agreement, and fully understood the same, and that this person executed the same, knowingly and voluntarily for the purposes and consideration therein expressed and in the capacity therein stated.

     GIVEN UNDER MY HAND AND SEAL OF OFFICE, this ____ of April, 2008.


Signed, sealed and delivered before me this _____ day of April, 2008

_____
NOTARY PUBLIC