UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AMCOR, INC.,

Plaintiff,

-against-

THE CIT GROUP/COMMERCIAL SERVICES, INC.,

Defendant.

Case No. 08 CV 4508 (BSJ)(HBP)
ECF

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT**

ORANS ELSEN LUPERT & BROWN LLP
Thomas A. Brown
875 Third Avenue, 28th Floor
New York, New York 10022
(212) 586-2211
*Attorneys for Plaintiff*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... ii

PRELIMINARY STATEMENT .......... 1

FACTS .......... 2

ARGUMENT .......... 4

I. Legal Standard .......... 4

II. There was no dispute between Amcor and LNT .......... 4

III. The Settlement between Amcor and LNT cannot excuse CIT's Breach .......... 9

CONCLUSION .......... 11

# TABLE OF AUTHORITIES

## CASES

A.J. Sheepskin Leather & Outerwear, Inc. v. USF Ins. Co.,
No. 03 Civ. 2382, 2004 WL 503727 (S.D.N.Y. Mar. 12, 2004) .......... 4

Allendale Mut. Ins. Co. v. Excess Ins. Co. Ltd.,
992 F. Supp. 278 (S.D.N.Y. 1998) .......... 8

American Home Products Corp. v. Liberty Mutual Ins. Co.,
565 F. Supp. 1485 (S.D.N.Y. 1983) .......... 7

Bettan v. Geico Gen. Ins. Co.,
296 A.D.2d 469, 745 N.Y.S.2d 545 (App. Div. 2d Dep't 2002) .......... 8

Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of New York,
10 N.Y.3d 187, 886 N.E.2d 127, 856 N.Y.S.2d 505 (2008) .......... 8

Bronx Sav. Bank v. Weigandt,
1 N.Y.2d 545, 136 N.E.2d 848, 154 N.Y.S.2d 878 (1956) .......... 7

Danleigh Fabrics v. Gaynor-Stafford Indus.,
95 A.D.2d 719, 463 N.Y.S.2d 828 (App. Div. 1st Dep't 1983) .......... 5, 6

Garden State Yarn Corp. v. Rosenthal & Rosenthal,
99 A.D.2d 721, 472 N.Y.S.2d 336 (App. Div. 1st Dep't 1984) .......... 5, 6, 7

MCI LLC v. Rutgers Cas. Ins. Co.,
No. 06 Civ. 4412, 2007 WL 4258190 (S.D.N.Y. Dec. 4, 2007) .......... 9

New York Univ. v. Continental Life Ins. Co.,
87 N.Y.2d 308, 662 N.E.2d 763, 639 N.Y.S.2d 283 (1995) .......... 8, 9

Ocean-Clear, Inc. v. Continental Cas. Co.,
94 A.D.2d 717, 462 N.Y.S.2d 251 (App. Div. 2d Dep't 1983) .......... 10

Rajchandra Corp. v. Title Guar. Co.,
163 A.D.2d 765, 558 N.Y.S.2d 1001 (App. Div. 3d Dep't 1990) .......... 8, 10

Takisada Co., LTD v. Ambassador Factors Corp., Division of Fleet Factors Corp.,
147 Misc.2d 435, 556 N.Y.S.2d 788 (Sup. Ct. N.Y. County 1989) .......... 6, 7

Vargas v. Ins. So. of North America,
651 F.2d 838 (2d Cir. 1981)........................................................................................ 7

**Other Authorities**

Black's Law Dictionary (8th ed. 2004)........................................................................... 7

## PRELIMINARY STATEMENT

Plaintiff Amcor, Inc. ("Amcor") respectfully submits this memorandum of law in opposition to defendant CIT Group/Commercial Services Inc.'s ("CIT") motion to dismiss the complaint.

Amcor brought this case to recover damages for CIT's breach of an agreement to provide insurance for payments by non-party Linens n' Things ("LNT") for 60,000 Global Positioning Systems, ("GPS units") delivered to LNT by Amcor. Because of concerns with LNT's financial health, Amcor insured payment for these 60,000 units with CIT at substantial expense before manufacturing and delivering these GPS units to LNT. In late January, just months before LNT filed for Chapter 11 bankruptcy protection, LNT refused to pay over $4 million to Amcor because of its financial inability to pay. In full compliance with its contractual obligations, Amcor then sought payment from CIT. CIT improperly refused to pay. (Complaint ¶ 17.)

CIT would have this Court rule that as soon as anyone from LNT uttered the word "dispute", whether in bad faith or as a tactic to disguise its poor financial condition, CIT was completely absolved of all its contractual obligations, regardless of whether there was a genuine dispute. Under CIT's view of the world, it can collect hundreds of thousands of dollars in premiums and incur no liability as long as a financially destitute retailer seeks to avoid payment to a supplier by asserting a spurious dispute in bad faith. This is simply not the law.

CIT's motion must be denied because the complaint clearly alleges that there was a contract between Amcor and CIT, that CIT's obligations were triggered by LNT's inability to pay Amcor and that CIT then breached that contract. No more is required.

## FACTS

In May of 2007, Amcor and LNT entered into a Vendor Agreement pursuant to which Amcor agreed to manufacture and deliver GPS units to LNT in return for a payment of $140 per unit. LNT ordered a total of 85,000 GPS units from Amcor, 60,000 of which were delivered and invoiced for a total of $8.4 million, and 25,000 of which were never delivered because LNT canceled its orders for them.[1] (Complaint ¶ 7.) Despite the fact that Amcor manufactured the 60,000 GPS units and delivered them to LNT pursuant to the terms of the Vendor Agreement, LNT refused to pay $4,575,625.60 of the $8.4 million due notwithstanding repeated demands that it pay, (Complaint ¶ 8), raising a series of spurious and baseless justifications for this refusal. Upon information and belief, LNT refused to pay solely because it lacked the financial ability to pay all of its vendors and chose not to pay Amcor. (Complaint ¶ 9.)

Amcor was investing a significant amount of its time, energy and resources into the GPS units to be delivered to LNT and questions concerning LNT's financial condition were raised during the summer of 2007 before any GPS units were manufactured or shipped. (Complaint ¶ 10.) Therefore, on August 31, 2007, before Amcor committed to deliver any GPS units to LNT, Amcor entered into a "Single Customer Credit Approved Receivables Purchasing Agreement" with CIT ("CIT Agreement") to insure payment of the GPS invoices. (Complaint ¶ 10.) In consideration for protection of certain rights under the CIT Agreement, Amcor paid CIT hundreds of thousands of dollars. But for the CIT Agreement and the protection it offered, Amcor would not have engaged in the business transaction with LNT. (Complaint ¶ 11.) Paragraph seven (7) of the CIT Agreement states:

> **PAYMENT OF APPROVED RECEIVABLES.** If any undisputed Approved Receivable remains unpaid for more than

---
[1]Only the invoices for the 60,000 units are at issue in this dispute.

> ninety (90) days after its due date, and you shall have delivered to us . . . a written Request for Payment of Approved Receivable in the form of **Annex B** attached to the Guide, with all of the information and documentation therein specified, requesting that the purchase price of such overdue and unpaid Approved Receivable be paid to you, we shall promptly . . . pay to you the Net Amount of such Approved Receivable . . . Our obligation to remit funds to you for the amount of any Approved Receivable shall only apply to an Approved Receivable (a) which is free of any claims, offsets or liens whatsoever, excluding any Permitted Lien, **and** (b) where the inventory and/or service has been received and accepted by the Customer without return and without dispute or claim as to price, terms, quality, workmanship, breach of warranty, delivery, quantity or other offset, **and** (c) where nonpayment by the Customer is due solely to the Customer's financial inability to pay, **and** (d) which you shall have sold, assigned and transferred to us as absolute owner all of your right, title, and interest thereto and therein.

CIT Agreement, Paragraph 7. (Emphases in original). CIT does not dispute that the entire $8.4 million owed by LNT to Amcor were Approved Receivables as defined by the CIT Agreement. Payment on the last invoice from Amcor to LNT at issue here was due on December 20, 2007. (Complaint ¶ 14.) By January 31, 2008, LNT had paid approximately $3.824 million of the $8.4 million owed to Amcor - leaving an outstanding balance of approximately $4.576 million – no further payments were made by LNT to Amcor. (Complaint ¶¶ 14-15.)

On January 31, 2008, as required by paragraph 7 of the Agreement, Amcor timely submitted a "Request for Payment of Approved Receivable(s)", dated January 28, 2008 requesting payment of approximately $4.576 million from CIT. (Complaint ¶ 16.) CIT improperly denied Amcor's request for payment and this refusal, along with Amcor's understanding of LNT's increasing precarious financial situation, prompted Amcor to enter into negotiations with LNT to secure payment of the amount owed on the 60,000 units, but LNT filed for protection under Chapter 11 of the Bankruptcy Code before any further payments were made

to Amcor. (Complaint ¶¶ 17-18.)[2] Amcor must therefore look to CIT to honor its contractual obligations to Amcor. (Complaint ¶ 18.)

## ARGUMENT

### I. Legal Standard

In deciding a motion to dismiss, the Court must "view the Complaint in the light most favorable to the plaintiff", "must accept as true the factual allegations stated in the Complaint", and "draw all reasonable inferences in favor of the plaintiff." A.J. Sheepskin Leather & Outerwear, Inc. v. USF Ins. Co., No. 03 Civ. 2382, 2004 WL 503727 at *2 (S.D.N.Y. Mar. 12, 2004) (internal citations and citations omitted). "A motion to dismiss can only be granted if it appears beyond doubt that the Plaintiff can prove no set of facts in support of its claim which would entitle them to relief." Id. (Citations omitted). Thus, the facts set forth in the complaint are controlling for this motion.

### II. There was no dispute between Amcor and LNT

The complaint alleges and discovery will show that there was no dispute between Amcor and LNT concerning the 60,000 GPS units for which Amcor sought payment from CIT. (Complaint ¶ 9.) CIT's claim that a genuine dispute existed at most creates a question of fact that must be resolved in Amcor's favor at this point. In addition, CIT's claim that the contract at issue here is a factoring agreement, which it is not, is contrary to an allegation in the complaint (¶10) and could at best create a question of fact that cannot be resolved on this motion. In fact,

[2]In its agreement with LNT, Amcor also settled its dispute with LNT over whether LNT improperly terminated its orders for the 25,000 units,

Amcor and CIT never had a factoring relationship.[3] The CIT Agreement was insurance paid for by Amcor and issued by CIT that insured that Amcor would be paid for the GPS units it manufactured and delivered to LNT if LNT had financial problems that prevented it from paying. LNT did not pay Amcor because of its financial problems, triggering the insurance. Nevertheless, CIT does not want to pay what it is obligated to pay. The law is clear that CIT cannot escape liability without making even the most basic investigation or inquiry into Amcor's claim. CIT's reliance on cases interpreting "factoring agreements" to suggest that it is absolved of any obligation to inquire concerning whether a dispute exists is misplaced both because the CIT Agreement at issue here is not a factoring agreement and because those cases appear to rely on clear language that is missing from the present agreement.

For example, the decision in the Garden State Yarn Corp. v. Rosenthal & Rosenthal, 99 A.D.2d 721, 472 N.Y.S.2d 336 (App. Div. 1st Dep't 1984) case relied upon by CIT turned on language stating that "we reserve the right at any time to charge back to your account the amount of the Receivable involved if an alleged claim, defense, or offset is asserted." 99 A.D.2d at 722, 472 N.Y.S.2d at 337 (emphasis in original). There is no reference to "alleged claim" or "asserted" in the CIT contract. Thus Garden State cannot help CIT here. Similarly, Danleigh Fabrics v. Gaynor-Stafford Indus., 95 A.D.2d 719, 463 N.Y.S.2d 828 (App. Div. 1st Dep't 1983) involved language absent here. In that case, the contract at issue stated:

> [W]here there is such dispute and/or claim . . .you may charge the amount of the receivable so affected or unpaid to the undersigned . . . where there is such dispute, claim, offset, defense, or counterclaim, the undersigned agrees that immediately upon the

---

[3] A factor is an "agent who is employed to sell property for the principal and who possesses or controls the property; a person who receives and sells goods for a commission." Black's Law Dictionary (8th ed. 2004) (emphasis added). Clearly this definition does not apply to CIT's relationship with Amcor, and as such any attempt to analogize the CIT Agreement to a factoring agreement must fail.

> occurrence of any such dispute, claim, offset, defense, or counterclaim, you shall no longer bear the loss on such receivables due to the financial inability of the customer to pay and such loss shall immediately revert to and be assumed by the undersigned without any act upon your part to effect the same.

95 A.D.2d at 720, 463 N.Y.S.2d at 829. This clause contains explicit language that the responsibility for the receivables that are subject to a dispute immediately revert to the seller. Moreover, the language in Danleigh refers generally to "dispute," suggesting that any dispute would trigger the reversion of the receivables. The language concerning disputes in the CIT Agreement is much narrower. The CIT Agreement refers to "dispute or claim as to price, terms, quality, workmanship, breach of warranty, delivery, quantity or other offset . . ." (CIT Agreement ¶ 7.) This implies that CIT must undertake at least some inquiry to determine whether a purported dispute falls within this list and whether the dispute is real or fabricated.

CIT's cases also apparently rely on an understood course of conduct in the factoring industry among factors and their customers that is absent here. As CIT acknowledges, Amcor and CIT did not have a factoring relationship. In fact, this limited agreement was the only interaction between the two companies. Thus CIT cannot rely on understood course of conduct that defines rights and responsibilities in the factoring context.

Another factoring case, Takisada Co., LTD v. Ambassador Factors Corp., Division of Fleet Factors Corp., 147 Misc.2d 435, 556 N.Y.S.2d 788 (Sup. Ct. N.Y. County 1989), that is not cited by CIT but which is as relevant as Garden State turned on language which read: " . . . except as hereinafter set forth, . . . provided that the merchandise represented thereby is duly delivered to and finally accepted and kept by the customer without dispute, bona fide or not, as to price, terms, delivery, quantity, quality or otherwise." Takisada, 147 Misc.2d at 436, 556 N.Y.S.2d at 789 (emphasis in original). No such carve out for whether a dispute is "bona fide or

not" is contained in the present contract. Thus Garden State and Takisada demonstrate that contracts can be written to say what CIT wants the CIT Agreement to say. The absence of such language in the CIT Agreement demonstrates that that agreement does not provide that the mere assertion of a dispute, whether bona fide or not, excuses CIT's obligation to pay Amcor. CIT, as the drafter of the CIT Agreement, could have included this language. It did not do so and cannot now read the contract to say something it does not.

This is especially so given the clear law that contracts, especially insurance contracts, are to be construed against the drafters. See, e.g., American Home Products Corp. v. Liberty Mutual Ins. Co., 565 F. Supp. 1485, 1492 (S.D.N.Y. 1983), (courts must "resolve ambiguities in insurance contracts in favor of the insured, and against the insurer."); Bronx Sav. Bank v. Weigandt, 1 N.Y.2d 545, 551, 136 N.E.2d 848, 851, 154 N.Y.S.2d 878, 883 (1956) ("The insurer has the burden of establishing that the words and expressions used not only are susceptible of [the] construction [that the insurer advocates], but that it is the only construction that can be fairly placed thereon." (Internal quotations and citations omitted) (emphasis added)). To determine the meaning of an ambiguous provision in an insurance contract, courts follow Vargas v. Ins. Co. of North America:

> [A]n ambiguous provision in an insurance policy is construed most favorably to the insured and most strictly against the insurer. . . . The insurer bears a heavy burden of proof, for it must establish that the words and expressions used (in the insurance policy) not only are susceptible of the construction sought by (the insurer) but that it is the only construction which may fairly be placed on them . . . The insurer is obliged to show (1) that it would be unreasonable for the average man reading the policy to (construe it as the insured does) and (2) that its own construction was the only one that fairly could be placed on the policy.

651 F.2d 838, 839-40 (2d Cir. 1981) (internal quotations and citations omitted). Thus, the omission of the language like that contained in Garden State and Takisada, demonstrates that the

CIT Agreement should be read to require CIT to pay Amcor when no bona fide dispute exists between Amcor and LNT and LNT is unable to pay Amcor what it owes. Furthermore, "[i]t is settled law that the insurer bears the burden of proving that a claim falls within the exclusions of an insurance policy," see, e.g., Rajchandra Corp. v. Title Guar. Co., 163 A.D.2d 765, 768, 558 N.Y.S.2d 1001, 1004 (App. Div. 3d Dep't 1990) (citing cases), and "if an insurer wishes to exclude coverage from its policy obligations, it must do so in clear and unmistakable language . . . [a]ny such exclusions are to be accorded a strict and narrow construction and are not to be extended by interpretation or implication." Id. (internal citations and citations omitted).

    The clear language of the CIT Agreement indicates that CIT cannot escape its good faith obligation to investigate the disputes alleged by LNT before refusing to honor its contractual obligation. "As in all contracts, implicit in contracts of insurance is a covenant of good faith and fair dealing, such that 'a reasonable insured would understand that the insurer promises to investigate in good faith and pay covered claims.'" Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of New York, 10 N.Y.3d 187, 194, 886 N.E.2d 127, 856 N.Y.S.2d 505, 509 (2008) quoting, New York Univ. v. Continental Life Ins. Co., 87 N.Y.2d 308, 318, 662 N.E.2d 763, 769, 639 N.Y.S.2d 283, 289 (1995). See also, Allendale Mut. Ins. Co. v. Excess Ins. Co. Ltd., 992 F. Supp. 278, 285 (S.D.N.Y. 1998) (finding that no breach of the duty of good faith and fair dealing occurred when insurer denied claim because before so doing the defendant undertook a "reasonable" investigation into the merits of the claim); Bettan v. Geico Gen. Ins. Co., 296 A.D.2d 469, 745 N.Y.S.2d 545 (App. Div. 2d Dep't 2002) (holding that no separate tort exists for "'insurance bad faith' based upon [insurer's] alleged failure to adequately investigate [insured's] claim," as such an allegation is already recognized in New York as "'a claim based on the alleged breach of the implied covenant of good faith and fair dealing.'") (internal citations

omitted); MCI LLC v. Rutgers Cas. Ins. Co., No. 06 Civ. 4412, 2007 WL 4258190, *4 (S.D.N.Y. Dec. 4, 2007) (citing the language of New York University that a "reasonable insured would understand that insurer promises to investigate in good faith" but noting that insured who makes a claim which an insurer "believes to be facially defective based on late notice or some other ground," may not be entitled to an investigation under New York law (emphasis added)).

In fact, the CIT Agreement suggests that CIT must first pay Amcor and then investigate. To wit, it provides that:

> If an Approved Receivable for which we have paid you is later determined to have been unpaid by the Customer for reasons other than solely the Customer's financial inability to pay, you agree to repurchase such Approved Receivable from us for the same amount we paid to you therefor . . . .

CIT Agreement ¶ 7. (Emphasis in original).

Thus, not only is CIT required to ensure that a dispute is bona fide before it can escape liability under the CIT Agreement, but it must pay Amcor before it undertakes an investigation to determine if it can escape liability.

III. The Settlement between Amcor and LNT cannot excuse CIT's Breach

The settlement between Amcor and LNT demonstrates that there was a dispute only about the 25,000 units that LNT cancelled, not the 60,000 units delivered to LNT that were Approved Receivables and are the subject of this dispute. (Complaint ¶ 18.) The Settlement Agreement was necessary because Amcor and LNT were disputing whether LNT had properly cancelled its order for 25,000 GPS units and had nothing to do with the claims here. That dispute was settled for $250,000, which was a substantial discount to the $3.5 million that had been invoiced for those units. This $3.5 million billed for the 25,000 units is not part of the

approved receivables at issue here. In contrast to the dispute over the 25,000 units, where LNT secured a substantial reduction in its liability, LNT agreed to pay essentially the full invoiced amount for the 60,000 units less some minor standard charge backs that were agreed to as part of the normal course of business. Because of LNT's financial distress, Amcor also agreed to let LNT pay a portion of the invoices over time, rather than having LNT pay up front and then seek reimbursement from Amcor for defective or returned units as was initially contemplated. The terms of this settlement providing for nearly full payment to Amcor on the invoices for the 60,000 units, which was executed at a time of growing financial precariousness for LNT, demonstrates that there was no bona fide dispute between Amcor and LNT over LNT's liability to Amcor on the invoices for which CIT is liable.

      The Court must also reject CIT's second argument, that the CIT Agreement is void because Amcor entered into this Settlement Agreement as of April 9, 2008 with LNT without CIT's prior consent. Under New York law, an insurance carrier may not "insist upon cooperation or adherence to the terms of its policy after it has repudiated liability on the claim . . . by sending a letter denying liability" see, Rajchandra Corp. v. Title Guar. Co., 163 A.D.2d 765, 769, 558 N.Y.S.2d 1001, 1004 (App Div. 3d Dep't 1990) (internal citations omitted), and as such "once an insurer repudiates liability . . . the [in]sured is excused from any of its obligations under the policy." Ocean-Clear, Inc. v. Continental Cas. Co., 94 A.D.2d 717, 718, 462 N.Y.S.2d 251, 252 (App. Div. 2d Dep't 1983) (citing cases) (emphasis added). While this entire issue is outside the complaint and not properly the subject of this motion, discovery will show that CIT had repudiated coverage under the CIT Agreement well before Amcor entered into the settlement with LNT. It will also show that Amcor advised CIT of the settlement before it was executed and that CIT did not object to it. Thus, the Settlement Agreement cannot excuse CIT's breach.

Moreover Amcor only executed the Settlement Agreement with LNT because CIT had refused to honor its contractual obligations. CIT cannot repudiate coverage and then rely on a later alleged breach of the terms of the CIT Agreement to avoid responsibility for its breach.

## CONCLUSION

CIT's motion to dismiss must be denied because CIT is contractually obligated to provide coverage to Amcor under the circumstances here.

Dated: New York, New York
July 14, 2008

Respectfully Submitted

ORANS ELSEN LUPERT & BROWN LLP

By: /s/ Thomas A. Brown
Thomas A. Brown
875 Third Avenue, 28th Floor
New York, New York 10022
(212) 586-2211
tbrown@oellaw.com

*Attorneys for Plaintiff*