Richard P. Norton
Ryan A. Becker
HUNTON & WILLIAMS LLP
200 Park Avenue -- 52nd Floor
New York, New York 10166-0005
212 • 309 • 1000

Attorneys for Defendant
The CIT Group/ Commercial Services, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
                              :
AMCOR, INC.,                  :
                              :
           Plaintiff,         :
                              :
     - against -              :   Case No. 08 CV 4508 (BSJ)(HBP)
                              :
THE CIT GROUP/ COMMERCIAL     :
SERVICES, INC.,               :
                              :
           Defendant.         :
                              :
------------------------------X

### DEFENDANT THE CIT GROUP/ COMMERCIAL SERVICES, INC.'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS

Defendant The CIT Group/ Commercial Services, Inc. ("CIT") submits its reply memorandum of law in support of its motion to dismiss the complaint. Capitalized terms herein have the same meanings as those in CIT's opening brief.

### I.   INTRODUCTION

Amcor's opposition brief does nothing to disturb the fact that, as shown in the pleadings and documents cited therein, LNT's failure to pay was the result of a dispute over defects in the GPS units received from Amcor. Its attempt to characterize the Agreement as insurance falls short, for the plain language and structure of the Agreement (which in no relevant way uses the words "insurance" or "insure") is a sale and assignment of accounts receivable, not an insurance

policy. Amcor has therefore failed to allege a viable claim for breach of contract, and the complaint must be dismissed.

## II.     ARGUMENT

**A.     <u>The Agreement Is Not An Insurance Policy.</u>**

Amcor attempts to distinguish the controlling law in CIT's opening brief by arguing that "Amcor and CIT never had a factoring agreement."[1] Its <u>only</u> support for this proposition is a definition of "factor" in Black's Law Dictionary, which states that a factor is a "person who receives and sells goods for a commission." Amcor Opp. Brief at 5. Because the Agreement did not involve the sale of goods for a commission, the argument goes, it is not a factoring agreement, and therefore must be an insurance policy.

But Amcor fails to identify another definition of "factor," only lines away in the same entry: a factor is "one who <u>buys accounts receivable at a discount</u>." Black's Law Dictionary (8th ed. 2004) (emphasis added). The Agreement is replete with evidence that it fits this definition. It is titled a "Single Customer Credit Approved Receivables Purchasing Agreement," and sets forth the terms of CIT's "<u>purchases</u> of certain of your [Amcor's] <u>accounts receivable</u>." See Imbriano Decl. Exh. 1, at 1 (submitted with CIT's opening brief) (emphasis added). Paragraph 2 of the Agreement provides that "you [Amcor] hereby sell, assign and transfer to us [CIT] as absolute owner all of your Approved Receivables[2] subject to any Permitted Lien." <u>Id</u>. at ¶ 2. CIT as the factor receives compensation equal to "4% of the gross face amount of each Approved Receivable." <u>Id</u>. at ¶ 4. This mirrors the typical structure of a factoring agreement:

---

[1] Amcor also argues that "[a]s CIT acknowledges, Amcor and CIT did not have a factoring relationship." Amcor Opp. Brief at 6. CIT made no such acknowledgment. The statement is accurate insofar as this was the first transaction between Amcor and CIT, but it is inaccurate for the reasons herein to say that the Agreement did not establish a factoring relationship.

[2] The parties do not dispute that the accounts at issue were "Approved Receivables" under the Agreement.

accounts receivable are assigned to the factor (id. at ¶ 2), whose compensation is a percentage of the receivables (id. at ¶ 4), and if the debtor cannot pay due to an inability to pay, the factor is stuck with the bill.  See Exportos Apparel Group, Ltd. v. Chemical Bank, 593 F. Supp. 1253, 1256 (S.D.N.Y. 1984).

       Though citing a litany of insurance cases in support of its position, Amcor does not cite a single case characterizing similar agreements as insurance policies,[3] or analyzing them under principles of insurance law.  To be sure, in these agreements "the factor is, in practical effect, an insurer of the customer's solvency."  Bonnie & Co. Fashions, Inc. v. Bankers Trust Co., 945 F. Supp. 693, 700 (S.D.N.Y. 1996).  But it does not follow from this that such agreements are "insurance" that are to be analyzed under principles of insurance law.  Factoring law is a well-developed set of commercial principles separate and distinct from insurance law.  Wechsler v. Hunt Health Systems, Ltd., 198 F. Supp. 2d 508, 519 (S.D.N.Y. 2002) (discussing the "well-settled principles of New York factoring law and the division of risk associated therein").  Westlaw, for example, has a separate Key number titled "Factors" devoted to these types of agreements.  Significantly, though the premise of Amcor's argument is that similar agreements are governed by insurance law, none of the cases it cites applies insurance principles to these agreements.  See, e.g., Garden State Yarn Corp. v. Rosenthal, 99 A.D.2d 721, 472 N.Y.S.2d 336 (1st Dep't 1984) (analyzing agreement under New York law of factoring); Danleigh Fabrics v. Gaynor-Stafford Indus., 95 A.D.2d 719, 463 N.Y.S.2d 828 (1st Dep't 1983) (same);  see also Exportos, 593 F. Supp. at 1256 (calling the operation of factoring agreements "well established" and analyzing contract at issue under factoring law).

---

[3]     The words "insurance" and "insure" appear nowhere in the Agreement, except for a single irrelevant reference to "insurance proceeds" constituting part of any receivables assigned to CIT.

Having used the wrong yardstick in its argument, Amcor is left with no support for its argument that the Agreement is governed by insurance principles. Controlling New York law analyzes these agreements under factoring principles, not insurance principles, and does not impose the duties of an insurance company on CIT. See State Bank of India v. Walter E. Heller Co., 655 F. Supp. 326, 332 (S.D.N.Y. 1987) (declining to impose additional duties on factor because to do so would do "unacceptable violence to that precise and well-established allocation of risk which makes factoring a useful facilitator of commerce"). Amcor's attempt to graft duties beyond those identified in the plain language of the Agreement is unsupported, and its claim must fail.

**B.    Regardless of How the Agreement is Characterized, Amcor's Claim Fails.**

    **1.    The receivables were not "undisputed" and owing "solely" because of LNT's inability to pay, as required by the Agreement.**

The Agreement provides that CIT would bear responsibility for any "undisputed Approved Receivable" that is: 1) "free of any claims, offsets or liens whatsoever;" 2) owed for goods that were accepted "without dispute or claim as to price, terms, quality, workmanship, breach of warranty, delivery, quantity or other offset;" and 3) due and owing "solely" because of LNT's financial inability to pay. See Imbriano Decl. Exhibit 1, at ¶ 7 (emphasis original). Amcor admits that it settled claims and a dispute with LNT regarding the GPS units, but contends that "there was no bona fide dispute between Amcor and LNT over LNT's liability to Amcor on the invoices for which CIT is liable." Amcor Opp. Brief at 10. The plain language of the Settlement Agreement and its attachments show otherwise.

As cited in CIT's opening brief, the recitals in the Settlement Agreement state that "LNT has contended that (a) many of the 60,000 GPS units are defective and that LNT not be should [sic] be required to pay the full amount of the invoices on the 60,000 GPS Units." See Exhibit 1

to the Declaration of Patrick Rohan, submitted herewith, at 0002. It further states that "bona fide disputes and controversies exist between AMCOR on the one hand, and LNT, on the other hand." Id. at 0003. The magnitude of the "bona fide disputes and controversies" becomes apparent upon review of correspondence between Amcor and LNT attached to the Settlement Agreement as an exhibit:[4]

- An e-mail from an executive vice president at LNT to Amcor's president notes "2 potentially major defects" in Amcor's GPS units, and that 6,800 or approximately 25% of the units had been returned by customers to LNT because of defects and other reasons. LNT's executive stated that the return rate eventually could reach as high as "60-80%." Id. at 0023.
- An e-mail one week later from LNT's executive vice president to Amcor's president stated that the GPS units were being returned by customers at the rate of "about 100 units/day," and that LNT had "disappointed a great many of our customers" with Amcor's products. Id. at 0028.
- As predicted by LNT's executive, its customers were dissatisfied with Amcor's GPS units. One customer wrote to LNT customer service that Amcor's product was "one of the worst things I have ever bought!" Id. at 0051.

In light of these statements, and others included in the settlement correspondence between Amcor and LNT, CIT had no obligation under the Agreement to pay Amcor. The receivables due from LNT met none of the three required conditions precedent triggering CIT's obligation to pay Amcor. The Approved Receivables were not "free of any claims, offsets or liens whatsoever," for LNT claimed a right to offset a significant amount of monies owed to Amcor because of significant defects in their products. Id. at 0028 (email from LNT vice president to Amcor stating that "I have no desire to hold your money past the offset of what the

---

[4] As discussed in n.2 to CIT's opening brief and the cases cited therein, the Court can consider the Settlement Agreement and its exhibits on the motion to dismiss because they were referenced in paragraph 18 of the complaint and are integral to the complaint.

cost of the inventory is at this point," and then stating that offset could reach $5.3 million) (emphasis added). Likewise, as the statements above make clear, the GPS units were not accepted "without dispute or claim as to price, terms, quality, workmanship, breach of warranty, delivery, quantity or other offset," but instead were the subject of serious dispute as to quality and workmanship. And finally, it cannot fairly be said that LNT's failure to pay was "solely" because of an inability to pay. The statements above make clear that there were many reasons LNT refused to pay Amcor.

Amcor's failure to meet any one of the three conditions precedent to CIT's obligation is fatal to its claim. Its request for payment failed to meet all three conditions. The Complaint must be dismissed.

**2.     The New York law of factoring requires that the Complaint be dismissed.**

New York courts interpreting contracts similar to the one at issue have unanimously held that a factor (here, CIT) is not under any duty to investigate potential disputes and is absolved of any obligation when a dispute is raised, bona fide or not. Recognizing that this law is fatal to their case, Amcor argues that these cases do not apply, because the language of the Agreement is not identical to the language of the agreements at issue in those cases. Amcor's argument must be rejected.

Danleigh Fabrics v. Gaynor-Stafford Indus., 95 A.D.2d 719, 720, 463 N.Y.S.2d 828, 829 (1st Dep't 1983) holds that a factor is relieved of its obligation to pay "solely upon the mere existence of a dispute and is in no way premised upon the underlying merit of the claim. The factor is not obligated in any way to investigate or evaluate the dispute or claim." Amcor argues that the holding of Danleigh does not apply because "Danleigh refers generally to dispute," and that the "language concerning disputes in the CIT agreement is much narrower." Amcor Opp. Brief at 6. Amcor's argument falls short for two reasons. First, Danleigh's holding addressed

factoring agreements generally, and did not turn on the specific language there at issue. Second, even if language in the Agreement is narrower, it is a distinction without a difference. Under the Agreement, the receivables presented by Amcor must be "without dispute or claim as to price, terms, quality, workmanship, breach of warranty, delivery, quantity or other offset." Even Amcor does not go so far as to say LNT's dispute over the GPS units did not involve a "dispute or claim" as to quality or workmanship. LNT's dispute is squarely a dispute under the Agreement, and the Danleigh holding applies.

Amcor's discussion of Garden State Yarn Corp. v. Rosenthal & Rosenthal, 99 A.D.2d 721, 472 N.Y.S.2d 336 (1st Dep't 1984) likewise misses the mark. The Garden State court noted that, in the language there at issue, "the factor bears the credit loss in case a buyer fails to pay because of financial inability to make payment, but not if non-payment is due to any other reason." 99 A.D.2d at 722, 472 N.Y.S.2d at 337 (emphasis added). The Agreement incorporates this same principle: CIT bears the credit loss only if the reason for LNT's non-payment was "solely" LNT's inability pay. Imbriano Decl. Exh. 1 at ¶ 7; see also Exportos, 593 F. Supp. at 1256 (holding that factor was under no obligation to pay because evidence showed "not so much an inability of [the retailer] to pay, as a preference not to").

Concerning the argument that the Agreement could have included the words "bona fide or not" to modify the word "dispute," Plaintiff would have the Court conclude that the absence of such language in the Agreement imposes an affirmative limitation on the type of dispute to which "dispute" refers. But this cannot be. The phrase "bona fide or not" adds nothing (except emphasis) to its antecedent. In essence, Plaintiff's argument must be that the instant contract is facially ambiguous with respect to whether, as Defendant asserts, "dispute" means "dispute," or, as Plaintiff seems to urge, "dispute" actually means something like "dispute, further investigation

of which would reveal no grounds for doubting LNT's motives in raising it." As between these two proposed meanings, there is only one reasonable interpretation.[5]

### 3. CIT is not liable for LNT's non-payment even if the dispute was a sham.

CIT was under no obligation to investigate or assess the merits of LNT's dispute. The cases cited at pages 6-7 of CIT's opening brief summarize New York law on this issue. The strength of this proposition is underscored by the principle that a factor is under no obligation to pay <u>even if</u> the dispute is determined to be a sham. In <u>Exportos</u>, a retailer disputed the quality and workmanship of clothes it received from a vendor because they did not fit. 593 F. Supp. at 1255. The retailer withheld payment on the invoice. <u>Id</u>. The dispute between the retailer and vendor was referred to arbitration, where the evidence showed that the retailer's "protestations of dissatisfaction with [vendor's] goods were [a] sham; and that in fact, after receiving them, [retailer] successfully resold the goods to purchasers of its own." <u>Id</u>. The court held that the factor had no obligation to pay, because even though the dispute was a sham, the vendor transferred only credit risk to the factor, not the risk that the retailer would raise spurious objections to its invoices. <u>Id</u>. at 1256. The raising of the dispute, even though it was a sham, relieved the factor of its obligation to pay.

The <u>Exportos</u> holding comports with the risk allocation in the Agreement. CIT agreed to assume the risk that LNT would fail to pay Amcor's invoices due to an inability to pay. It did not assume the risk that LNT would withhold payment for any other reason, such as defects in

---

[5] Amcor's further argument, that contracts are to be construed against their drafters, is inapplicable. Amcor overlooks the equally familiar principle that if there is no ambiguity to resolve, there is no need to resort to the against-the-drafter rule in the first place. "[W]here there is no inherent ambiguity, courts should not, under the guise of judicial construction, reach an artificial interpretation in order to relieve a party from an improvident bargain." <u>Libra Bank Ltd. v. Banco Nacional De Costa Rica, S.A.</u>, 570 F.Supp. 870, 893 (S.D.N.Y. 1983). Moreover, contractual ambiguity "is not established simply because the parties disagree as to the meaning of a particular provision." <u>Id.</u>

quality or workmanship. This makes sense, because "the factor does not purport to conduct its customer's business for the customer; the factor merely assures the customer against loss by reason of financial inability of the buyer to pay; all other problems remain those of the factor's customer, the plaintiff." Garden State, 99 A.D.2d at 722, 472 N.Y.S.2d at 337. The reasons for this risk allocation are obvious: the plaintiff, as the one that took the order, produced the products and delivered them, is in the best position to assess disputes and address them. CIT, a commercial finance company, is not equipped to assess and resolve problems with electronics guided by satellites. That risk remained with Amcor.

In addition, the financial dynamics of the contract assumed that, if LNT did not pay solely because of an inability to pay, and LNT ended up in a bankruptcy proceeding, CIT could file a claim in bankruptcy for the full amount due to Amcor. The Agreement did not assume that such claim, already impaired by the bankruptcy, would be further impaired by disputes and offsets over which CIT had no control. See Imbriano Decl. Exh. 1 at ¶ 1. The reasons for this, again, are obvious: at the time of entering the Agreement, CIT was only in a position to assess the credit risk of LNT. It was not in a position to assess the risk that Amcor's unmade products would have significant defects.

CIT was under no duty or obligation to assess the merits of LNT's dispute (though cursory review of the relevant documents shows ample grounds for concluding the dispute was genuine). Even if discovery were to show that LNT's dispute was a sham, the law requires that the complaint be dismissed, because the risk of LNT disputing the invoices remained with Amcor, not CIT.

### III.    CONCLUSION

For the foregoing reasons, and the reasons stated in the opening brief, the complaint should be dismissed.

Dated: New York, New York
       July 28, 2008

                                              Respectfully submitted,

                                              HUNTON & WILLIAMS LLP

                                        By: /s/    Ryan A. Becker
                                              Richard P. Norton
                                              Ryan A. Becker
                                              200 Park Avenue
                                              New York, New York 10166-0005
                                              212 • 309 • 1000
                                              rnorton@hunton.com
                                              rbecker@hunton.com

                                              Attorneys for Defendant
                                              The CIT Group/ Commercial Services, Inc.

DECLARATION OF SERVICE

Bradford C. Mulder, hereby declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that:

I am Managing Clerk at the law firm of Hunton & Williams LLP, attorneys for Defendant The CIT Group/Commercial Services, Inc.

That on July 28, 2008, I served a true copy of the attached Defendant The CIT Group/Commercial Services, Inc.'s Reply Memorandum of Law in Support of its Motion to Dismiss, on Plaintiff's Counsel, at the address listed below, via the Court's Authorized ECF Transmission Facilities.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 28, 2008

/s/ Bradford C. Mulder
Bradford C. Mulder

TO:   Thomas A. Brown, II
      Orans, Elsen Lupert & Brown LLP
      875 Third Avenue, 28th Floor
      New York, New York 10020
      tbrown@oellaw.com